**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>JONATHAN D. GEORGES<br><br>Debtor<br><br>GERIATRIC FACILITIES OF CAPE COD, INC.<br><br>Plaintiff<br><br>v.<br><br>JONATHAN D. GEORGES<br><br>Defendant | Chapter 7<br>Case No. 19-11761-MSH<br><br><br><br><br>Adversary Proceeding<br>No. 19-01096-MSH |

**MEMORANDUM OF DECISION**

The plaintiff Geriatric Facilities of Cape Cod, Inc., operating as Pleasant Bay Nursing and Rehabilitation Center ("Pleasant Bay"), initiated this adversary proceeding with a complaint against the defendant Jonathan D. Georges, the debtor in the main chapter 7 case. Pleasant Bay seeks a judgment that a debt owed to it by Mr. Georges be excepted from Mr. Georges's bankruptcy discharge pursuant to Bankruptcy Code § 523(a)(2)(A) and § 523(a)(4).[1] After a bench trial on November 18, 2020, conducted remotely by video due to the public health emergency created by the worldwide Covid-19 pandemic, I now set forth my findings of fact and conclusions of law in this matter.

---

[1] All references to the Bankruptcy Code or Code are to 11 U.S.C. §§ 101-1532.

## I. Background

On January 10, 2010, Mr. Georges was granted power of attorney by his mother, C. Doris Georges. According to the durable power of attorney form that was executed, Mr. Georges was "[t]o act on [Ms. Georges's] behalf in all matters affecting [her] property or the administration of [her] financial and medical affairs, with the same force and effect and to all intent [sic] and purposes as though [she] were personally present and acting for [herself]." Ms. Georges appointed her grandson, Mr. Georges's son Justin, as her alternate attorney-in-fact in the event Mr. Georges was unable to act. Among other powers, Mr. Georges was authorized to act as Ms. Georges's attorney-in-fact in relation to her bank accounts and real estate.

Mr. Georges understood that his duty as Ms. Georges's attorney-in-fact was to carry out her wishes when those wishes were expressed, and if she was incapable of expressing her wishes, to act as he believed she would have wished. Ms. Georges had repeatedly expressed to Mr. Georges her desire that a portion of her assets be dedicated to gifts to her relatives. Mr. Georges also knew that Ms. Georges had always been generous in making loans and gifts to her children when they needed money in the past.

Around the time she granted power of attorney to her son, Ms. Georges's health was failing and she was having trouble living on her own. Overcoming Ms. Georges's resistance to moving out of her home, Mr. Georges arranged for his mother to be admitted to The Woodlands, an assisted living facility owned and operated by Pleasant Bay.[2] At some point after her arrival

---

[2] The trial record is confusing and inconsistent as to when Ms. Georges moved into The Woodlands. Although Mr. Georges testified that Ms. Georges moved into The Woodlands sometime in April 2010, a copy of a check dated February 6, 2010, indicating a $1,000 payment from Ms. Georges's checking account to The Woodlands, was admitted into evidence. I find that Ms. Georges had moved into The Woodlands by February of 2010, although the exact date is uncertain.

at The Woodlands, Ms. Georges no longer had sufficient income or savings to pay the cost of her occupancy at The Woodlands and began accruing charges.

By April of 2010, Ms. Georges needed more assistance than was available at The Woodlands and moved into the neighboring skilled nursing center owned and operated by Pleasant Bay, which, confusingly, was also referred to as Pleasant Bay.[3] (To distinguish between Pleasant Bay, the company, and Pleasant Bay, the nursing facility, I will refer to the latter as "Pleasant Bay Home.")  Upon Ms. Georges's admission to Pleasant Bay Home, a services agreement, dated April 27, 2010, was executed by her grandson Justin, as alternate attorney-in-fact under her power of attorney.[4]  The services agreement contained a section entitled "Responsible Party Obligations."  The term "Responsible Party" is capitalized when used in this section but is not defined anywhere in the agreement.  I find that the following language in the Responsible Party Obligations section of the services agreement offers the best available definition:

> You [the nursing home resident] may have a Responsible Party who is responsible for managing your finances for your benefit, for paying your obligations under this Agreement and for applying your funds and assets, including Social Security checks, pensions, etc. to pay for the nursing facility services rendered to you.

Both parties agree that Mr. Georges was the Responsible Party under the agreement even though the agreement itself lists Justin Georges, the defendant's son.

At the time the services agreement was entered into, Ms. Georges had two sources of income—$1,389 a month from social security and $1,021.24 a month from an annuity.  This

---

[3] A skilled nursing center provides a higher level of care and supervision than an assisted living facility.

[4] Mr. Georges, the defendant and primary attorney-in-fact, was out of town at the time and authorized his son to sign all necessary documents.

3

was not enough income to cover the outstanding unpaid balance due from her previous stay at The Woodlands and the accruing costs of her residency at Pleasant Bay Home. Initially during her residency at Pleasant Bay Home, Ms. Georges was covered to some extent by Medicare. After her Medicare benefit ran out, Ms. Georges's monthly charge at Pleasant Bay Home typically exceeded $8,000 a month. Mr. Georges, as Ms. Georges's attorney-in-fact, understood that he would have to sell Ms. Georges's condominium in Brewster, Massachusetts, to raise the funds necessary to pay her obligations to Pleasant Bay.

In June of 2010, Mr. Georges, as attorney-in-fact for his mother, executed a promissory note whereby Ms. Georges promised to pay Pleasant Bay $28,943.91, to cover the outstanding balance due for her residency at The Woodlands. Both Mr. Georges and Pleasant Bay understood that this note would be paid from the sale proceeds of Ms. Georges's condominium.

Mr. Georges intended to use the condominium sale proceeds to pay off the promissory note and to bring Ms. Georges current on her obligations as a resident of Pleasant Bay Home. He also intended to apply on Ms. Georges's behalf for assistance from the state's Medicaid program, known as MassHealth. It was Pleasant Bay's practice, as communicated to Mr. Georges, to bill its Pleasant Bay Home residents at private-pay rates until Medicaid eligibility was established and then to accept Medicaid payments (supplemented by social security and other retirement benefits) as payment in full retroactive to the date of Medicaid eligibility.

The sale process took longer than expected but in March of 2011, Mr. Georges, as attorney-in-fact, sold Ms. Georges's condominium. Ms. Georges netted $247,395.03 from the sale. The funds were deposited into Ms. Georges's checking account where they were comingled with other funds, including Ms. Georges's monthly social security and annuity income. Mr. Georges had unlimited deposit and withdrawal rights in the account both in his

4

capacity as Ms. Georges's attorney-in-fact and as a named co-owner of the account. From the account, Mr. Georges paid a total of $104,128.91 to Pleasant Bay. These payments brought Ms. Georges current on all her outstanding obligations to Pleasant Bay as of March 2011, including paying off the promissory note. Also in March 2011, as Ms. Georges's attorney-in-fact, Mr. Georges wrote a series of checks totaling $63,500 in gifts to various members of Ms. Georges's family, including himself. Over the next few months, Mr. Georges disbursed substantially all the funds remaining in Ms. Georges's checking account. Some of the funds went to pay Pleasant Bay for current bills, but a significant amount went to Mr. Georges or to third parties on his behalf to pay for his personal expenses, including purchasing a car and a computer.

In the summer or fall of 2011, after the sale proceeds of the condominium had been spent, and in keeping with his plan to convert Ms. Georges from a private-pay resident at Pleasant Bay Home to one covered by Medicaid, Mr. Georges, as attorney-in-fact for Ms. Georges, applied on her behalf for Medicaid through MassHealth. Her application was denied in essence due to the substantial gifts to family members from the proceeds of the sale of her condominium.[5] Mr. Georges's attempts to re-apply for Medicaid and to appeal MassHealth's denials were equally unsuccessful.

At some point approximately coincident with the initial application to MassHealth, Mr. Georges stopped making payments to Pleasant Bay on behalf of his mother, including from her monthly social security and annuity income. He began transferring those funds to his personal checking account where he held them while the Medicaid application was being processed, assuming that once Medicaid was approved Pleasant Bay would true-up Ms. Georges's account

---

[5] Mr. Georges had made no attempt to conceal the gifts in the Medicaid application. In fact, he disclosed many of them. He did not understand until the application was denied that such gifts could negatively impact Ms. Georges's eligibility for Medicaid.

5

and at that point he would pay whatever balance was owed. When the Medicaid application was denied, Mr. Georges continued to withhold Ms. Georges's social security and annuity income rather than making partial payments to Pleasant Bay. Knowing that his mother had nowhere near enough income to pay Pleasant Bay at its private-pay rates, Mr. Georges hoped to use the lump sum social security and annuity funds he had been collecting and withholding to reach some sort of settlement with Pleasant Bay. Mr. Georges's strategy did not succeed, and in September of 2012, he moved Ms. Georges out of Pleasant Bay Home to another nursing facility, using the social security and annuity funds he had amassed to fund the move. Ms. Georges died on July 6, 2013.

In October 2012, Pleasant Bay brought a state court action against Mr. Georges, individually and as "legal representative" of Ms. Georges, for the money owed for Ms. Georges's residency at Pleasant Bay Home. Because Ms. Georges never qualified for Medicaid, Pleasant Bay's claim was based on full private-pay rates. In July of 2016, Mr. Georges and Pleasant Bay settled the litigation with Mr. Georges agreeing to a judgment being entered against him in the amount of $128,000, plus post-judgment interest. At the trial in this court, no evidence was presented that the state court judgment was accompanied by any findings whatsoever as to Mr. Georges's conduct in connection with the indebtedness owed to Pleasant Bay.

On May 23, 2019, Mr. Georges filed his voluntary petition for relief under chapter 7 of the Code. He listed the judgment debt owed to Pleasant Bay as undisputed in his bankruptcy schedules. It is this debt that Pleasant Bay seeks to have excepted from Mr. Georges's discharge.

6

## II. The Parties' Positions

Pleasant Bay asserts two reasons why I should except the debt owed to it from Mr. Georges's discharge. First, it argues that Mr. Georges incurred the debt by false representations or false pretenses within the meaning of Code § 523(a)(2)(A) by promising to devote all Ms. Georges's income and assets to paying her bills from Pleasant Bay when he had no intention of doing so. Second, Pleasant Bay asserts that under Code § 523(a)(4), Mr. Georges owed a fiduciary duty to his mother as her attorney-in-fact, breached that duty by spending her money other than to pay her nursing home bills, and that Pleasant Bay was a third-party beneficiary of the fiduciary relationship and suffered financial loss as a result of Mr. Georges's breach.

Mr. Georges counters that he spent his mother's money, including making gifts to family members and to himself, in keeping with her wishes or as he believed she would have wished, that he did not understand or agree that she (or he on her behalf) was obligated to devote every penny of her assets to pay Pleasant Bay, and that he stopped paying Pleasant Bay from her social security and annuity income because Pleasant Bay refused to give him receipts for each monthly payment.

## III. Legal Standards

In keeping with the Code's fresh start policy, the requirements for a discharge are "construed liberally in favor of the debtor." *See Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987)); *see also Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). To except a debt from discharge, a plaintiff creditor "must show that [its] claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." *Palmacci*, 121 F.3d at 786 (internal quotation marks omitted). The plaintiff bears the burden to prove by a preponderance of the evidence every element of a

7

§ 523(a) claim. *Id.* at 787 ("The burden of proof and the burden of production as to each element rests with the party contesting the dischargeability of a particular debt under Bankruptcy Code § 523.").

    a.    <u>Section 523(a)(2)(A)</u>

Section 523(a)(2)(A) of the Code excludes from discharge any debt for services "to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." In order to prevail on a § 523(a)(2)(A) claim a plaintiff must prove that a debtor: 1) made a knowingly false representation or made one in reckless disregard for the truth, or made an implied misrepresentation or created a false impression by his conduct, 2) intended to deceive, 3) intended to induce the creditor's reliance; and the creditor 4) actually relied upon the misrepresentation or false pretense, 5) relied justifiably, and 6) suffered damage as a result. *Dewitt v. Stewart (In re Stewart)*, 948 F.3d 509, 520 (1st Cir. 2020).

    b.    <u>Section 523(a)(4)</u>

A debt incurred through "fraud or defalcation while acting in a fiduciary capacity" is not dischargeable. 11 U.S.C. § 523(a)(4). This exception to discharge applies only to fiduciaries acting under an express or technical trust. *See Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333 (1934); *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 17 n. 3 (1st Cir. 2002). "[D]efalcation requires some degree of fault, closer to fraud, without the necessity of meeting a strict specific intent requirement," "something close to a showing of extreme recklessness." *Baylis*, 313 F.3d at 18, 20; *see also Raso v. Fahey (In re Fahey)*, 482 B.R. 678, 688-89 (B.A.P. 1st Cir. 2012). The United States Court of Appeals for the First Circuit has made clear that "not every breach of fiduciary duty amounts to defalcation." *Baylis*, 313 F.3d at 20. To constitute defalcation, a

8

fiduciary's actions must be so egregious as to approach the level required to prove fraud, embezzlement, or larceny. *Id.* Additionally, the fiduciary must have a culpable state of mind based on knowledge of, or gross recklessness in relation to, the improper conduct. *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013).

IV. **Applying the Law to the Facts**

    a. **Section 523(a)(2)(A)**

In count I of its complaint seeking non-dischargeability under Code § 523(a)(2)(A), Pleasant Bay asserts that at the time the services agreement for the housing and care of Ms. Georges was entered into in April 2010, and at relevant times thereafter, Mr. Georges, who was a Responsible Party under the agreement, represented and agreed that he would devote all of Ms. Georges's income and assets to pay for her residency at The Woodlands and Pleasant Bay Home; that at the time he made these representations and agreements Mr. Georges had no intention of living up to them; and that Pleasant Bay justifiably relied on Mr. Georges's representations and agreements and suffered financial loss as a result. Specifically, Pleasant Bay claims that at the time the services agreement was entered into and at relevant times thereafter, Mr. Georges knew that his mother (as well as he himself) intended to devote a portion of her income and assets to expenditures other than to pay Pleasant Bay, including making substantial gifts to Mr. Georges and other family members, and failed to disclose this intention to Pleasant Bay.

Pleasant Bay has failed to carry its burden of proof with respect to its claim. First, no reasonable reading of the services agreement supports Pleasant Bay's interpretation that Ms. Georges and Mr. Georges were contractually bound to devote every cent of Ms. Georges's income and assets to pay Pleasant Bay. The agreement required "applying your funds and assets, including your Social Security checks, pensions, etc. to pay for the nursing facility

9

services rendered." "Applying" does not signify to the exclusion of everything else, nor does "your funds and assets, including your Social Security checks, pensions, etc." set forth a sufficiently detailed description of the universe of assets encompassed by the agreement. Had Pleasant Bay wanted to bind its residents to devoting the entirety of their income and assets to the payment of nursing home expenses, to the exclusion of everything else, it needed far more detailed and explicit contractual terms. This is especially true in situations like the one here, involving unsophisticated consumers in stressful circumstances, unrepresented by an attorney.

I find that at the time Mr. Georges became a Responsible Party under the services agreement in January 2010, and thereafter until the fall of 2011, when Ms. Georges's Medicaid application was denied, Mr. Georges never misrepresented to or intended to mislead Pleasant Bay. I find that Mr. Georges intended to use substantially all Ms. Georges's social security and annuity income to pay Pleasant Bay, to sell her condominium and use the proceeds to bring current all her charges from Pleasant Bay outstanding at the time of the sale, and to apply for Medicaid to cover her future nursing home costs. I find that Mr. Georges did not understand that Ms. Georges could be disqualified from receiving Medicaid by using a portion of the sale proceeds from her condominium to make gifts to family members, including Mr. Georges. And he certainly did not understand that making such gifts was a violation of the services agreement. To the extent Pleasant Bay believed that it was, its belief was unjustified.

In the summer of 2011, Mr. Georges stopped paying Ms. Georges's social security and annuity income to Pleasant Bay, setting the money aside in his personal checking account. He testified credibly, and I find, that he did so believing that until Ms. Georges's Medicaid application had been approved, it wasn't clear how much she would owe to Pleasant Bay and

10

once approval occurred and Ms. Georges's pay-rate had been established, he intended to pay what was owed.

When the Medicaid application was denied, however, and it became clear to Mr. Georges that Ms. Georges would have to pay Pleasant Bay at its private-pay rate, the situation changed. At that point, Mr. Georges's failure to apply Ms. Georges's social security and annuity income to Pleasant Bay's bills was without justification. I do not find credible Mr. Georges's explanation that he intended to pay the money but Pleasant Bay refused to give him receipts and so he withheld it. Rather, I find that once it became clear to Mr. Georges that Ms. Georges was not going to be receiving Medicaid assistance, he realized there was no way she could afford Pleasant Bay's private-pay rates. He tried to use the social security and annuity money he had been hoarding as leverage to negotiate a settlement with Pleasant Bay that might allow his mother to remain in residence at Pleasant Bay Home or at the very least to settle her large unpaid bill. When his efforts failed, he used the money to move Ms. Georges into another nursing home.

While Mr. Georges's conduct in withholding Ms. Georges's social security and annuity income may have been wrongful and a breach of the services agreement, it did not involve fraud, misrepresentation or false pretenses within the meaning of Code § 523(a)(2)(A). If a breach of contract, even an intentional one, were grounds for excluding a debt from discharge, the bankruptcy fresh start coveted by so many debtors would be a futile aspiration, indeed. *See Daily v. Garrett (In re Garrett)*, BAP No. EC-16-1265-HKuB, 2018 WL 4057228, at *4 (B.A.P. 9th Cir. Aug. 24, 2018) (citing *Hein v. Emery (In re Emery)*, 52 B.R. 68, 70 (Bankr. E.D. Pa. 1985)).

11

To summarize, Mr. Georges's gifting substantial amounts from the sale proceeds of Ms. Georges's condominium did not constitute a breach of the Pleasant Bay services agreement. Furthermore, he had no duty to tell Pleasant Bay of his mother's intentions to make gifts to him and other family members, and to the extent Pleasant Bay assumed that all Ms. Georges's assets and income would be devoted to her nursing home charges, that assumption was unjustified. Finally, while Mr. Georges as Ms. Georges's attorney-in-fact and as a Responsible Party under the services agreement did have a contractual obligation to pay Pleasant Bay available sums derived from Ms. Georges's social security and annuity income and his failure to do so after Ms. Georges's Medicaid application had been denied was a breach of contract, his conduct did not constitute fraud, misrepresentation or false pretenses within the meaning of § 523(a)(2)(A).

    **b.**    **Section 523(a)(4)**

In count II of its complaint, Pleasant Bay asserts that Mr. Georges's failure to direct all Ms. Georges's assets and income to paying Pleasant Bay was a breach and defalcation of his fiduciary duty to Ms. Georges under the power of attorney, and that as a third-party beneficiary of that relationship, Pleasant Bay's judgment claim against Mr. Georges is non-dischargeable under Code § 523(a)(4).

To begin with, it is necessary to determine if Mr. Georges owed a fiduciary duty to his mother under the power of attorney. In Massachusetts, it appears settled that a power of attorney creates a fiduciary relationship between a principal and her attorney-in-fact. *Perez v. First Option Mortg. Corp. (In re Perez)*, Ch. 13 Case No. 08-40693-JBR, Adv. No. 08-4081, 2008 WL 4164372, at *5 (Bankr. D. Mass. Sept. 3, 2008) (citing *Gagnon v. Coombs*, 654 N.E.2d 54, 60 (1995)). But the generic fiduciary duty created by a power of attorney does not alone establish the type of fiduciary relationship which is

12

a prerequisite to § 523(a)(4) relief. *Smith v. Marcet (In re Marcet)*, 352 B.R. 462, 473 (Bankr. N.D. Ill. 2006) (collecting cases and suggesting that "elevated level of fiduciary duty . . . could give rise to the requisite fiduciary capacity required by § 523(a)(4)"); *see also Richardson v. Mills (In re Mills)*, 555 B.R. 106, 131-32 (Bankr. D. Mass. 2016) (citing *Marcet*, 352 B.R. at 473). "Not all persons treated as fiduciaries under state law are considered to act in a fiduciary capacity for purposes of federal bankruptcy law." *Follett Higher Educ. Grp., Inc. v. Berman (In re Berman)*, 629 F.3d 761, 767 (7th Cir. 2011) (internal quotation marks omitted).

Whether a debtor is acting as a fiduciary for purposes of § 523(a)(4) is a matter of federal law. *MacPherson v. Marano (In re Marano)*, 568 B.R. 723, 730 (Bankr. D. Mass. 2017) (citing *Fahey*, 482 B.R. at 688). The definition of fiduciary under this section is construed narrowly. *Fahey*, 482 B.R. at 688. Federal law requires an express or technical trust which creates an elevated level of fiduciary duty on the part of the trustee. *See Emery v. Maggio (In re Maggio)*, 518 B.R. 179, 190 (Bankr. D. Mass. 2014) (discussing *Allen v. Scott (In re Scott)*, 481 B.R. 119, 190 (Bankr. N.D. Ala. 2012)). An express trust requires "an explicit declaration of trust, a clearly defined trust *res*, and an intent to create a trust relationship," while a technical trust comes from statute or common law. *Fahey*, 482 B.R. at 687-88 (internal quotation marks omitted). Only fiduciaries under an express or technical trust are subject to the severe penalty of non-dischargeability under § 523(a)(4). *See Marano*, 568 B.R. at 730.

The durable power of attorney executed by Ms. Georges appointing Mr. Georges as her attorney-in-fact contains none of the traditional trust language that would create an elevated fiduciary relationship. There is no declaration of trust. There is no trust res

13

identified. There is no imposition on a trustee of an obligation to administer the trust res for the benefit of a beneficiary. *See* Restatement (Third) of Trusts § 13 (2003) ("A trust is created only if the settlor properly manifests an intention to create a trust relationship."). The power of attorney merely authorizes Mr. Georges to present himself to all the world as if he were Ms. Georges—to act in her "name, place and stead." Implicit in this power is that Mr. Georges act as Ms. Georges would have acted, that is, in a manner consistent with her self-interest. Such implicit duty lacks the specificity to create the elevated level of duty required to invoke a § 523(a)(4) claim.

But even assuming, as the parties here appear to assume, that the fiduciary duty created by the Georges power of attorney is sufficient to qualify under § 523(a)(4), there remains the requirement of defalcation. The First Circuit has made it clear that a defalcation while acting in a fiduciary capacity requires a degree of fault approaching fraud, embezzlement or larceny. *Baylis*, 313 F.3d at 20. Additionally, the U.S. Supreme Court, in *Bullock,* 569 U.S. at 269, has established that defalcation requires a culpable state of mind involving knowledge of, or gross recklessness in relation to, the improper conduct.

Here, the defalcation alleged by Pleasant Bay is Mr. Georges's failure to earmark all of Ms. Georges's income and assets to pay her nursing home bills. As previously discussed, I do not find that the services agreement created such an obligation but even if it did, the breach of the services agreement alone would not constitute a defalcation.

Pleasant Bay argues that Mr. Georges's diverting a substantial portion of the sale proceeds from Ms. Georges's condominium to make gifts to himself and other family members and his failing to pay all her social security and annuity income to Pleasant Bay,

14

move the needle of Mr. Georges's breach of fiduciary duty close enough to fraud to make it a defalcation. I do not agree. I have found that the services agreement did not obligate Ms. Georges or Mr. Georges, as her attorney-in-fact and as a Responsible Party, to direct all her income and assets to paying Pleasant Bay. I have also found that Mr. Georges did not understand that making gifts would disqualify his mother from Medicaid eligibility or violate the services agreement. I find further from the uncontroverted evidence at trial that Mr. Georges believed it was his mother's wish that some of her cash be distributed as gifts to her relatives and that she would have wanted him to use some of the money for his personal expenses. Thus, not only was Mr. Georges not breaching his duty to Ms. Georges in making those gifts, but also he believed he was faithfully fulfilling his duty. Had Mr. Georges's conduct resulted in Ms. Georges's being priced out of skilled nursing home care, exposing her to health and safety risks, perhaps it could be argued that Mr. Georges's spending habits approached a level of recklessness equating to defalcation. But this did not happen. When he couldn't work out his payment difficulties with Pleasant Bay, Mr. Georges moved his mother to another nursing facility where she resided until her death in 2013.

Even assuming for the sake of discussion that Mr. Georges had a fiduciary duty to his mother and that he had defalcated in his performance of that duty, all within the meaning of § 523(a)(4), it would still fall upon Pleasant Bay to establish that *its* debt was non-dischargeable as a result. Pleasant Bay makes this interpretive leap of statutory construction by claiming to be a third-party beneficiary of the Georges power of attorney.

15

Pleasant Bay has failed to develop fully its third-party beneficiary argument, merely referencing broad concepts in contract and agency law.[6] The evidence presented at trial does not support Pleasant Bay's claim to be a third-party beneficiary under the power of attorney.

The Restatement (Second) of Contracts provides:

> Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Restatement (Second) of Contracts § 302(1) (1981); *see also McLain v. Citizens Bank, N.A. (In re McLain)*, 604 B.R. 108, 118 (Bankr. D. Mass. 2019). Intent is determined by the language and circumstances of the contract, and the intent must be clearly and definitely shown. *Anderson v. Fox Hill Vill. Homeowners Corp.*, 676 N.E.2d 821, 822-23 (Mass. 1997). Incidental beneficiaries, that is those who are not intended beneficiaries, lack standing to enforce a contract. *See Choate, Hall & Stewart v. SCA Servs., Inc.,* 392 N.E.2d 1045, 1051 (Mass. 1979); Restatement (Second) of Contracts § 302(2) (1981).

Neither the power of attorney document itself nor any of the evidence introduced at trial in connection with its execution supports a finding that Pleasant Bay was an

---

[6] As to Pleasant Bay's suggestion of a contract-related argument, it has not established that the power of attorney had all the necessary elements of a contract. For the purposes of this decision, I assume without deciding that a power of attorney is at least sufficiently analogous to a contract to support the relevance of Pleasant Bay's contract-related argument. As to Pleasant Bay's suggestion of an agency-related argument, it references an agent's potential liability to a third party in tort, based upon a breach of duty owed by the agent to the third party, but does not explain how such liability fits within the context of a § 523(a)(4) claim.

intended beneficiary under the power of attorney or that Mr. Georges's performance as attorney-in-fact was intended to satisfy an obligation of Ms. Georges to Pleasant Bay. The power of attorney does not explicitly reference Pleasant Bay. It was executed on January 10, 2010. The Pleasant Bay services agreement was not executed until April 27, 2010. No evidence suggests that at the time the power of attorney was executed either of the Georgeses had any inkling that Ms. Georges would need long-term skilled nursing care at Pleasant Bay Home at a cost that would require Ms. Georges to redirect the use of her income and assets. Mr. Georges testified, and I find, that when Ms. Georges relocated to The Woodlands she had the financial wherewithal to pay. Pleasant Bay's argument that when the power of attorney was established on January 10, 2010, the parties intended that Pleasant Bay benefit from the agreement is not supported by the evidence. At best, Pleasant Bay was at the time an incidental beneficiary of the power of attorney with no standing to enforce it. *See Choate*, 392 N.E.2d at 1051.

To summarize, Mr. Georges's fiduciary duty under his mother's power of attorney did not create the elevated level of duty that is contemplated by § 523(a)(4). But even if it did, Mr. Georges's conduct as alleged by Pleasant Bay would not constitute a defalcation as that term has been defined by binding Supreme Court and First Circuit precedent. Assuming, nevertheless, that Mr. Georges was a defalcating fiduciary within the meaning of § 523(a)(4), there is no legal authority or factual basis supporting Pleasant Bay's position that it is a third-party beneficiary under the power of attorney or that as a third-party beneficiary its claim is subject to non-dischargeability under § 523(a)(4).

17

**V.      Conclusion**

Pleasant Bay has failed to meet its burden of proof that its claim against Mr. Georges is non-dischargeable under either Code § 523(a)(2)(A) or § 523(a)(4).   Judgment shall enter in favor of Mr. Georges on both counts of the complaint.

Dated: June 22, 2021

By the Court,

Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:   J. Alexander Watt, Esq.
Barnstable, Massachusetts
for the plaintiff, Geriatric Facilities of Cape Cod, Inc.

Peter M. Daigle, Esq.
Centerville, Massachusetts
for the defendant, Jonathan D. Georges

18